**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BENNIERITA SMITH and EDWARD SMITH, JR., Plaintiffs, v. MONSANTO COMPANY, Defendant. | Case No. COMPLAINT DEMAND FOR JURY TRIAL |

## INTRODUCTION

1. In 1970, the Monsanto Company discovered the herbicidal properties of glyphosate and began using it in its products by 1974, marketing it under the brand name herbicide Roundup. Roundup is a non-selective herbicide used to kill weeds. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

2. Bennierita Smith used the weed killer Roundup, an herbicide created and manufactured by the Monsanto Company, on her property for over ten years. Roundup was supposed to be safe, after all, Monsanto promoted Roundup as being harmless to humans for over thirty years. In truth, the active chemical in Roundup—glyphosate—is a carcinogen, and Monsanto has known this fact for decades.

3. On February 3, 2016, Mrs. Smith was evaluated for a left tonsillar mass presenting with throat pain. On February 4, 2016, she underwent a biopsy and was diagnosed with large B-cell Lymphoma of the left tonsil with involvement of the left cervical nodes, stage IE.

4. The International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate. The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened

to avoid potential conflicts of interest, to conduct a systematic review of all publically available information about glyphosate. The year-long study resulted in the publication of an IARC Monograph—the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen—the second highest hazard rating. Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma.

5. Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

6. Plaintiffs Bennierita Smith and Edward Smith, Jr. are citizens of the State of Louisiana and reside in Covington, Louisiana in the Parish of St. Tammany.

7. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto is a citizen of Missouri and Delaware and is not a citizen of Louisiana. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. In addition, Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of Louisiana, maintains and carries on

systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

10. Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

11. Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

12. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

13. Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

14. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

15. For about 40 years, farmers and the general population around the world have used Roundup containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen.

16. Monsanto assured the public that Roundup was harmless. In order to prove this,

Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe. As a result of this deception the general public has been exposed to a carcinogen, while Monsanto has made billions.

## I. Registration of Herbicides

17. The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

18. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

19. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20. FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that

are required of the manufacturer.

21. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

22. In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

23. In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

**II. Scientific Fraud Underlying the Marketing and Sale of Roundup**

24. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

25. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

26. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to

perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup with the EPA.. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid.

27. Three top executives of IBT were convicted of fraud in 1983.

28. In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

## III. Monsanto Falsely Advertised Roundup as Being Safe for Decades

29. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b. "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It ... stays where

you apply it."

f. You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

30. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c. glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d. glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f. glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

31. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

## IV. Assessments of Glyphosate and Roundup

32. IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

33. IARC is transparent. The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny. Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.

34. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

35. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

36. A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the

various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

37. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

38. In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

39. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

40. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41. The studies considered the various exposure groups, including occupational

exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

42. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

43. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

44. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

45. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

46. Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0.

47. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

48. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in

blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

49. Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup causes cancer.[1]

50. In the IARC monograph for glyphosate, there is an entire section devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy

[1] In addition to DNA damage and oxidative stress, scientists have suggested Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer.

Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

52. In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

53. Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

54. In addition to the studies examining glyphosate, research also suggests that the carcinogenic properties of Roundup are magnified by the addition of adjuvants in the Roundup formulation. Adjuvants are chemicals that are designed to modify or enhance the effects of other agents. Monsanto has been including adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide. Studies show, however, that the addition of adjuvants also greatly increases the carcinogenic properties of Roundup. Notably, Monsanto has systematically tested glyphosate without the adjuvents and used those tests to lobby the EPA that Roundup is safe.

55. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the

dangers of the use of Roundup are more widely known.

56. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

57. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

58. France banned the private sale of Roundup and glyphosate following the IARC assessment.

59. Bermuda banned both the private and commercial sale of glyphosate, including Roundup. The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

60. The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

61. The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

62. In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

63. In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

64. In June 2016, the European Union refused to re-register glyphosate containing herbicides due to safety concerns and will, in all likelihood, begin recalling all glyphosate-

containing products within the European Union. Indeed, in June 2016, the EU did not vote to extend the registration of glyphosate due to safety concerns. The fate of the product in Europe is now in question.

**V. Plaintiff Bennierita Smith's Exposure to Roundup**

65. Mrs. Smith first purchased Roundup at Home Depot in Covington, LA in 2005.Mrs. Smith frequently used Roundup around her property to manage weeds in her lawn and garden and regularly used Roundup on her property between 2005 until September 2016.

66. When Mrs. Smith purchased Roundup, she believed that it was not a carcinogen and she specifically relied on the labeling and promotion of Roundup as being safe to humans in making her decision to purchase and use the product.

67. Mrs. Smith did nearly all of the gardening work around her home herself, regularly spraying Roundup around trees, fencing, sidewalks, landscape rocks, and her driveway for, in total, eleven years.

68. On February 3, 2016, Mrs. Smith was evaluated for a left tonsillar mass presenting with throat pain. On February 4, 2016, she underwent a biopsy and was diagnosed with large B-cell Lymphoma of the left tonsil with involvement of the left cervical nodes, stage IE on February 20, 2016.

69. Over the next few months, Mrs. Smith underwent aggressive treatment for her cancer, including multiple rounds of chemotherapy.

70. Mrs. Smith did not learn of the link between Roundup exposure and Non-Hodgkin Lymphoma until 2016, at which point she ceased using any Roundup products.

**LIMITATION ON ALLEGATIONS**

71. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

72. The allegations in this pleading are made pursuant to Louisiana law. To the extent Louisiana law imposes a duty or obligation on Monsanto that exceeds those required by federal law, Plaintiffs do not assert such claims.

73. As alleged in this pleading, in addition to violating Louisiana law, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

**COUNT I**
**(Design Defect under LSA-RS 9:2800.5)**

74. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

75. Plaintiffs bring this strict liability claim against Monsanto for defective design.

76. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiffs, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiffs, as described above.

77. At all times relevant to this litigation, Monsanto's Roundup products were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

78. These design defects rendered Roundup unreasonably dangerous.

79. The dangers posed by Roundup go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

80. Additionally, the benefits of the Roundup design are outweighed by the design's inherent risk of danger in causing cancer.

81. At all times relevant to this litigation, Roundup products reached the intended

consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including the Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

82. At all times relevant to this action, Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

83. Monsanto could have employed a safer alternative design to render Roundup safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup's defective design. Monsanto's Roundup products were and are more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Thus, at the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

84. Mrs. Smith was exposed to Monsanto's Roundup products in the course of her activity to care for her lawn and garden as described above, without knowledge of Roundup's dangerous characteristics.

85. At all times relevant to this litigation, Mrs. Smith used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner, *i.e.*, as home landscaper, without knowledge of Roundup's dangerous characteristics.

86. The Plaintiffs could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

87. The defects in Monsanto's Roundup products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Monsanto's misconduct and omissions,

Plaintiffs would not have sustained their injuries.

88. Monsanto's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiffs herein.

89. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs', with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

90. As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiffs were injured and has sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

91. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT II**
**(Inadequate Warning under LSA-RS 9:2800.57)**

92. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

93. Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

94. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

95. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

96. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiffs of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

97. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Such warnings could have been disclosed in circumstances not limited to the Roundup labeling.

98. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiffs.

99. Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs.

100. Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

101. At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

102. Bennierita Smith was exposed to Monsanto's Roundup products in the course of her activity in caring for her lawn and garden, as described above, without knowledge of their dangerous characteristics.

103. At all times relevant to this litigation, Mrs. Smith used and/or was exposed to the use of Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

104. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Mrs. Smith's exposure. Mrs. Smith relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

105. Monsanto knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

106. This alleged failure to warn is not limited to the information contained on

Roundup's labeling. Monsanto was able, in accord with federal law, to comply with Louisiana law by disclosing the known risks associated with Roundup through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, did not disclose these known risks through any medium.

107. To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

108. As a result of their inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Plaintiffs in the course of caring for their lawn and garden.

109. Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

110. Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Mrs. Smith could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

111. As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiffs sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

112. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III
**(Breach of Express Warranty under LSA-RS 9:2800.58)**

113. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

114. Defendants expressly warranted that Roundup was safe and well accepted by consumers.

115. Roundup does not conform to these express representations, because Roundup is not safe and carries with it an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

116. As a direct and proximate result of the breach of these warranties, Plaintiffs suffered and will continue to suffer severe and permanent personal injuries, losses, and damages.

117. Plaintiffs relied on Defendants' express warranties. Furthermore, the express warranties represented by Defendants were a part of the basis for Bennierita Smith's use of Roundup and she relied upon these warranties in deciding to use Roundup

118. At the time of the making of express warranties, Defendants had knowledge of the purpose for which Roundup was to be used, and warranted same to be in all respects safe, effective, and proper for such use.

119. Defendants expressly represented to Plaintiffs that Roundup was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

120. Defendants knew or should have known that, in fact, their representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, Roundup produced serious injuries to the users that were not accurately identified and represented by Defendants.

121. As a result of the foregoing acts and omissions, Defendants caused Plaintiffs to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including, but

not limited to: past and future medical expenses; past and future loss of earnings; past and future loss and impairment of earning capacity; mental anguish; severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life.

**COUNT IV**
**(Breach of Warranty in Redhibition)**

122. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

123. Roundup contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

124. Pursuant to Louisiana Civil code article 2520, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold. Roundup, which was sold and promoted by Defendants, possesses a redhibitory defect because it is unreasonably dangerous, as described above, which renders Roundup useless or so inconvenient that it must be presumed that Plaintiff, Bennierita Smith, would not have bought Roundup had she known of the defects.

125. Defendants were aware of the substantial risks of associated with Roundup but failed to fully disclose those risks to Plaintiffs.

126. In accordance with Louisiana Civil Code article 2545, Defendants, as the manufacturers, distributors and sellers of Roundup, are deemed to be aware of its redhibitory defects.

127. Had Plaintiffs been made aware of the defects contained in Roundup, they would not have purchased Roundup. This characteristic rendered Roundup unfit for its intended purposes.

128. Defendants are liable to Plaintiffs under the theory of redhibition as a consequence of the sale to Plaintiffs of a product unfit for its intended use.

129. Plaintiffs are entitled to the return of purchase price paid for Roundup, including, but not limited to, purchase price, interest on these amounts from the date of purchase, attorneys' fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiffs may be entitled.

130. As a result of the aforementioned breach of obligation by Defendants, Plaintiff, Bennierita Smith, suffered and continues to suffer from the following items of damage, all past, present, and future, for which she is entitled to be compensated by Defendants, *in solido*, in an amount which is just and reasonable:

a. Medical and related expenses;
b. Physical injury and disability;
c. Physical pain and suffering;
d. Mental anguish and distress;
e. Loss of earnings;
f. Impairment to earning capacity;
g. Loss of enjoyment of life; and
h. Other items of damage which may be shown through discovery or at trial.

131. By reason of the foregoing, Plaintiffs demand judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000.00, together with interest, costs of suit, and all such other and further relief as the Court deems proper.

**COUNT V**
**Negligence**

132. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

133. Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

134. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

135. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

136. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

137. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiffs' injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

138. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

139. As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and

injuries.

140. Monsanto was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the of the context of labeling.

141. Monsanto its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

142. Monsanto's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup products so as to ensure they were at

least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g. Failing to disclose to Mrs. Smith, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiffs and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j. Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the

products were unreasonably unsafe and dangerous.

143. Monsanto knew and/or should have known that it was foreseeable consumers such as the Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

144. The Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

145. Monsanto's negligence was the proximate cause of Plaintiffs' injuries, i.e., absent Monsanto's negligence, Mrs. Smith would not have developed cancer.

146. Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of punitive damages.

147. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI
## Fraud

148. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

149. Monsanto has defrauded the agricultural community in general and Plaintiffs in particular by misrepresenting the true safety of Roundup and by failing to disclose known risks of cancer.

150. Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce

oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

151. Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup was misbranded under 7 U.S.C. § 136(g) and its distribution within Louisiana and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

152. When Plaintiff Bennierita Smith purchased Roundup from Home Depot in Covington, Louisiana, between 2005 and 2016, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup or that the product could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Plaintiffs were unaware of these material facts and/or omissions prior to purchasing the product. Plaintiff Bennierita Smith paid for the product using her own money, money she would not have expended absent the Monsanto's misrepresentations and/or material omissions concern the fact that Roundup is a carcinogen.

153. Plaintiff Bennierita Smith relied on the Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup and its active ingredient glyphosate in deciding whether to purchase and/or use the product on her property. Mrs. Smith did not know nor could she reasonably have known of the misrepresentations and/or material omissions by Monsanto concerning Roundup and its active ingredient glyphosate.

154. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc.

Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

155. When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup.

156. Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

157. As a proximate result of Monsanto's fraudulent and deceitful conduct and representations, Plaintiffs sustained damages and other losses in an amount to be proven at trial.

158. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

159. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

160. Monsanto's conduct as alleged herein was done with oppression, fraud, and malice. Monsanto was fully aware of Roundup's safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

161. This was not done by accident or through some justifiable negligence. Rather,

Monsanto knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Monsanto would make selling Roundup in Louisiana. This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff Bennierita Smith was robbed of her right to make an informed decision about whether to purchase and use an herbicide on her property, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiffs' rights.

162. There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiffs request punitive damages against Monsanto for the harms caused to the Plaintiffs.

## **JURY TRIAL DEMAND**

163. Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## **PRAYER FOR RELIEF**

164. WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Monsanto, awarding the Plaintiffs:

a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b. exemplary and punitive damages sufficient to punish and deter Monsanto and others from future fraudulent practices;

c. pre-judgment and post-judgment interest;

d. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e. any other relief the Court may deem just and proper.

Dated: January 31, 2017 **RESPECTFULLY SUBMITTED:**

/s/ Nicholas R. Rockforte
Nicholas R. Rockforte, LA Bar No. 3130
Christopher L. Coffin, LA Bar No. 27902
**PENDLEY, BAUDIN & COFFIN, L.L.P.**
P. O. Drawer 71
24110 Eden Street
Plaquemine, Louisiana 70765
Phone: 225/687-6396
Fax: 225/687-6398
**nrockforte@pbclawfirm.com**